# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-2566

_____

Alex Falk; Annie Falk;                     *
Big Bend Ranch Hunting, Inc.;              *
Mohammed Hattum; Bob Nystrom,              *
                                           *
            Appellants,                    *
                                           *   Appeal from the United States
      v.                                   *   District Court for the
                                           *   District of South Dakota.
United States, by and through The          *
Department of the Interior, United         *
States Fish and Wildlife Service,          *
                                           *
            Appellee.                      *

_____

Submitted: February 17, 2006
Filed: July 5, 2006

_____

Before LOKEN, Chief Judge, LAY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Appellants, South Dakota landowners, commenced a declaratory judgment action challenging decisions made by the United States Fish and Wildlife Service ("FWS") affecting the use of their land for goose hunting. After considering the

stipulated facts, the district court[1] entered judgment in favor of FWS, finding that its decisions were reasonable and not arbitrary or capricious. We affirm.

## I. *Background*

Appellants Alex Falk, Annie Falk, Mohammed Hattum, and Bob Nystrom all own land in South Dakota. They all use their land for both the planting of crops and hunting of migratory fowl. Appellant Big Bend Ranch Hunting, Inc., leases the right to hunt the Falks' land. Appellants receive significant income from both farming and commercial hunting operations. For example, Big Bend Hunting Ranch normally receives an average of $284,250 in annual gross revenue for a season of hunting, in addition to approximately $9,000 gross revenue derived from membership charges for its waterfowl hunting club.

To attract the maximum number of geese, the Falks and Hattum leave corn standing in their fields, harvesting only a few rows at a time. By harvesting a few rows of corn at a time, the appellants essentially ration the supply of corn available for the geese to eat because the geese will not venture into the standing corn. Because appellants' corn crop residue provides a known food source, the geese return annually as they migrate.

Planting and harvesting methods are permissible under FSW regulations as long as they are considered "normal." Appellants' incremental harvesting technique often delays their harvest beyond December 1 of any given year. In 1999, Officer Bob Prieksat, the federal warden, informed the Falks that hunting in fields harvested after December 1 would be illegal. Since that time, the Falks have complied with Officer Prieksat's conclusion. Dr. Robert Hall, an agronomist for the United States Department of Agriculture Cooperative Extension Service ("CES") and a professor

---

[1]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

of plant sciences at South Dakota State University, opined that a normal harvest would take place before December 1. Dr. Hall estimated that 95 to 100 percent of the corn in South Dakota is harvested by December 1. In reaching this conclusion, Dr. Hall relied on a South Dakota Agricultural Statistics Service publication entitled "Seeding to Harvest" that covered years 1970–1994. Dr. Hall also estimated that nearly 90 percent of the corn harvest in South Dakota is completed by November 14 in any given year. The earliest harvest considered in the published survey was October 29, 1991, in which roughly 100 percent of the planted corn was harvested. By contrast, the latest harvest contained in the published survey was November 24, 1992, which resulted in a harvest of only 50 percent of the crop planted that year. Thus, the longer corn remains in the field, the potential for loss increases due to excessive drying, excessive moisture, wind loss, and stalk breakage.

In recent years, the entire goose hunting season has tended to start and end later each year. For example, a recent goose season opened on October 24, 2004, and closed on January 28, 2005. The appellants wish to "tailor their [corn] harvesting to the goose hunting season in order to maximize the number of geese attracted" to their property during the hunting season by harvesting their crop a few rows at a time and completing their harvest after December 1.

Although geese will not venture into standing corn, geese will feed on green wheat growing in fields. With that goose trait in mind, the appellants wish to aerially seed winter wheat in their standing corn crop to attract geese in addition to continuing post-December 1 corn harvesting. Officer Prieksat informed the plaintiffs that hunting in a field seeded in this manner would be illegal. Dr. Hall opined that aerial seeding was not a recommended method for planting wheat in South Dakota. Aerial seeding permits the wheat to be infected by bacteria harbored in the corn residue, resulting in a loss of 10 to 100 percent of the wheat harvest. In addition, Dr. Hall noted that although aerial seeding is sometimes used in emergencies, such as years in which the

fields are too wet to support ground-driven equipment, growers are generally disappointed with the results.

In 2001, a neighbor to the Falks' land harvested a cornfield adjacent to the Falks' property after December 1. This neighbor, who competes with the Falks through his own commercial waterfowl hunting operation, contacted Alex Falk and told him that his field probably would be considered baited. If considered baited, Falk's pits adjacent to the neighbor's baited field could not be legally hunted. Falk contacted Officer Prieksat, who confirmed that it would be illegal to hunt waterfowl in the Falks' fields that were influenced by the neighbor's baited area.

## II. *Discussion*

On appeal, the appellants challenge determinations of the FSW that: (1) harvesting after December 1 does not constitute "normal harvesting"; (2) aerial seeding does not constitute "normal planting"; and (3) hunting is prohibited within the zone of influence of a baited area regardless of who baited the area.

We review the agency decisions for an abuse of discretion. The Administrative Procedure Act provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A); *see also Bradley v. Bureau of Alcohol, Tobacco, & Firearms*, 736 F.2d 1238, 1240 (8th Cir. 1984). In *Bradley*, we explained that:

> The "arbitrary and capricious" standard of review is a narrow one. Its scope is more restrictive than the "substantial evidence" test which is applied when reviewing formal findings made on a hearing record. "Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis." Something more than mere error is necessary to meet the test. To have administrative action set aside as arbitrary and capricious, the party challenging the action must

-4-

prove that it was "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case[.]"

736 F.2d at 1240 (citations omitted). "Similarly, we accord substantial deference to an agency's interpretation of its own regulation, which we are bound to uphold unless it violates the Constitution or a federal statute, or unless the interpretation is plainly erroneous or inconsistent with the regulation." *Coalition For Fair & Equitable Regulation of Docks on Lake of the Ozarks v. F.E.R.C.*, 297 F.3d 771, 778 (8th Cir. 2002) (citation and internal quotations omitted).

FSW regulations prohibit the taking of migratory birds "[b]y the aid of baiting, or on or over any baited area." 50 C.F.R. § 20.21(i). Generally, one may permissibly hunt "where seeds or grains have been scattered solely as the result of a normal agricultural planting, harvesting, post-harvest manipulation or normal soil stabilization practice," provided that the area is not otherwise considered baited. § 20.21(i)(1)(i). The regulations define "baiting" as "the direct or indirect placing, exposing, depositing, distributing, or scattering of salt, grain, or other feed that could serve as a lure or attraction for migratory game birds to, on, or over any areas where hunters are attempting to take them." 50 C.F.R. § 20.11(k). "Normal agricultural planting, harvesting, or post-harvest manipulation means a planting or harvesting undertaken for the purpose of producing and gathering a crop, or manipulation after such harvest and removal of grain, that is *conducted in accordance with official recommendations of State Extension Specialists of the Cooperative Extension Service of the U.S. Department of Agriculture*." § 20.11(g) (emphasis added).

A. *Harvesting after December 1*

First, the appellants seek a declaratory judgment that their preferred harvesting methods do not constitute baiting. Specifically, the appellants argue that they have complied with the regulations because (1) they have planted their fields for the purpose of producing and gathering crops; and (2) the regulations do not require that

the purpose of planting the crop is to produce the maximum yield. Therefore, according to the appellants, they should not be penalized for harvesting their crop after December 1 in order to increase the number of geese attracted to their fields.

However, while the regulations do not require that a crop be harvested to produce the maximum yield, the regulations do require that landowners use "normal harvesting." Section 20.11(g) defines "normal harvesting" as harvesting conducted in accordance with the official recommendations of the CES. The recommendations of Dr. Robert Hall, an agronomist for the CES, represent the official recommendations of the CES. Dr. Hall estimated that between 95 to 100 percent of the corn in South Dakota is harvested by December 1. In making his estimation, Dr. Hall relied on a South Dakota Agricultural Statistics Service publication entitled "Seeding to Harvest" that covered years 1970–1994. Dr. Hall also estimated that nearly 90 percent of the corn harvest in South Dakota is completed by November 14 in any given year. The CES's determination that a normal harvest is completed by December 1 was based on substantial evidence. Accordingly, we hold that FSW's reliance upon the CES data was consistent with the regulations and not arbitrary and capricious. As a result, we affirm.

## B. *Aerial Seeding*

The appellants also challenge the agency's determination that aerial seeding of winter wheat is not "normal planting" and represents baiting. As with the date of harvest above, § 20.11(g) defines "normal planting" as planting conducted in accordance with the official recommendations of the CES. Dr. Hall stated that the aerial seeding of winter wheat into standing corn was not a recommended wheat planting method in South Dakota. Aerial seeding often causes the wheat to be infected by bacteria found in the corn residue and results in substantial losses of 10 to 100 percent of the wheat harvest. Dr. Hall noted that aerial seeding is sometimes used in emergencies but that it generally produces disappointing results.

The appellants also attempt to argue that aerial seeding should be permitted because a FWS brochure allows for the planting of a "goose field," provided that the seeds germinate at least ten days prior to hunting. However, in the paragraph preceding the one highlighted by the appellants, the brochure states "Lands planted by means of top sowing or aerial seeding can only be hunted if seeds are present solely as the result of normal agricultural planting . . . ." (App. 82).

Because aerial seeding of winter wheat into standing corn is not "normal planting," the agency's prohibition of hunting pursuant to § 20.21(i)(1)(i) on land seeded in that manner is not arbitrary and capricious.

## C. *Zone of Influence*

Lastly, the appellants contend that the government could not lawfully close their property to hunting because of a neighbor's baiting on adjoining land. Admittedly, the regulations are not a model of clarity on this point; however, the agency's interpretations of the regulations are reasonable when § 20.21(i) is considered in light of § 20.11(j).

Under § 20.21(i), a person is prohibited from taking migratory birds "[b]y the aid of baiting, or on or over any baited area." A "baited area" is "any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, if that salt, grain, or other feed *could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them*." § 20.11(j) (emphasis added). The italicized language describes the zone of influence of a baited area. *See United States v. Manning*, 787 F.2d 431, 438 (8th Cir. 1986) ("[The FWS Agent] determined that the geese were taken within the zone of influence of the bait based on his firsthand observations and his eleven years of experience . . . ."). Considering § 20.21(i) and § 20.11(j) together, it is reasonable to interpret the regulations prohibiting hunting within the zone of influence of a baited area. *See United States v. Chandler*, 753 F.2d 360, 362 (4th Cir. 1985) ("The manifest intent of

the regulation [§ 20.21(i)] is to prohibit the taking of waterfowl that are lured to an area by bait."). Whether an area is a "baited area" is a factual determination. *Manning*, 787 F.2d at 437 ("Congress must have intended for the violation to turn on the factual determination that birds are being lured to a hunter's shooting location, no matter how far the bait is from that location." (quoting *Chandler*, 753 F.2d at 363)).

In the instant case, the Falks' neighbor harvested his land after December 1, 2001. Because harvesting corn after December 1 is not "normal harvesting," the neighbor's land was a "baited area" within the meaning of § 20.11(j). As a result, any area within the zone of influence of the neighbor's late harvest would be precluded from hunting. The agency's interpretation of the regulations is reasonable.

Appellants do not dispute the agency's definition of zone of influence. However, appellants contend that the acts of third parties on land not owned or controlled by appellants should not diminish appellants use of their own land particularly when such acts could be done maliciously by competitors. For reversal, appellants rely on *Allen v. Merovka*, 382 F.2d 589 (10th Cir. 1967). However *Allen* is distinguishable from the case at bar. The regulation at issue in *Allen* defined "baited area" more narrowly than the regulation at issue here. *Id.* at 590. The regulation in *Allen* did not include language that gives rise to the zone of influence notion discussed above.[2] *Id.* Thus, *Allen* did not discuss the zone of influence. The *Allen* court's holding pertained to the "by aid of baiting" language. *Id. Allen* held that the prohibition on

---

[2]The regulation at issue in *Allen* defined "baited area" as "any area where shelled, shucked, or unshucked corn, wheat or other grain, salt or other feed whatsoever capable of luring, attracting, or enticing such birds is directly or indirectly placed, exposed, deposited, distributed or scattered." *Id.* at 590 (citing 50 C.F.R. § 10.3(b)(9)). By contrast, 50 C.F.R. § 20.11(j), which is the relevant regulation in the case at bar, defines "baited area" as "any area on which salt, grain, or other feed has been placed, exposed, deposited, distributed, or scattered, *if that salt, grain, or other feed could serve as a lure or attraction for migratory game birds to, on, or over areas where hunters are attempting to take them*." (emphasis added).

hunting in a "baited area" required that the hunters have some part, directly or indirectly, in the baiting or that the baiting is done for their benefit. *Id*. at 591.

We hold that the FWS's interpretation of the regulations as prohibiting hunting within the zone of influence of a baited area, regardless of who baited the area, is not plainly erroneous.

### III. *Conclusion*

The district court correctly entered judgment for the government. The agency's determinations were not arbitrary and capricious, and the agency's interpretation of the regulations is not plainly erroneous. Therefore, we affirm.

_____