# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 10-2129

_____

Abdulaziz M. Sugule and                      *
AMS & Associates, Inc.,                       *
                                              *
                Appellants,                   *
                                              *    Appeal from the United States
        v.                                    *    District Court for the
                                              *    District of Minnesota.
Denise Frazier, Field Office, District        *
Director, USCIS; Gerard Heinauer,             *
Director, Nebraska Service Center,            *
USCIS; Emilio Gonzales, Director,             *
USCIS; Eric H. Holder, Jr.,                   *
Attorney General of the United States;        *
Janet Napolitano, Secretary, United          *
States Department of Homeland                 *
Security; and Robert S. Mueller,              *
Director, FBI,                                *
                                              *
                Appellees.                    *

_____

Submitted: December 14, 2010
Filed: April 4, 2011

_____

Before LOKEN, ARNOLD and BYE, Circuit Judges.

_____

BYE, Circuit Judge.

After the Department of Labor (DOL) had granted an alien employment certification to AMS & Associates, Inc., thereby clearing a path for its employee Abdulaziz Sugule to apply for an immigrant visa, the Department of Homeland Security (DHS) revoked the DOL's certification on the ground of fraud. The DHS based its finding on three documents in which Sugule represented to two private parties he was the sole owner of AMS. For various reasons, the DHS disregarded eighteen items of evidence which Sugule offered in support of his assertion he never held any interest in AMS and misrepresented his ownership status in an attempt to embellish his financial status. Because none of the DHS's reasons withstands scrutiny, we find its actions arbitrary and capricious and its findings not supported by substantial evidence. Accordingly, we reverse the grant of summary judgment in favor of the governmental defendants and remand to the district court with instructions to vacate the DHS's revocation of labor certification and further remand the case to the agency.

I

On September 17, 2002, Minneapolis accounting firm AMS & Associates, Inc., filed Form ETA-750, Application for Alien Employment Certification, on behalf of its staff accountant Abdulaziz Sugule, a citizen of Canada. As part of that form, AMS certified it had advertised the position in a Minneapolis newspaper of general circulation for the requisite number of weeks and received no qualified applicants ready, willing, and able to take the job.[1]

The DOL certified the application on February 11, 2003. Implicit in the DOL's certification was its finding that "(1) sufficient United States workers are not able,

---

[1]AMS represented it has difficulty attracting qualified United States workers because of its primary clientele: Minneapolis's large Somali community. In that sense, AMS maintains, Sugule, an ethnic Somali, fits the firm's needs uniquely well.

willing, qualified, and available for a particular job; and (2) employment of a particular alien will not adversely [affect] the wages and working conditions of United States workers similarly employed." Ramirez v. Holder, 609 F.3d 331, 333 (4th Cir. 2010) (citation omitted); see 8 U.S.C. § 1182(a)(5)(A)(i). After receiving the certification, AMS turned to the DHS to petition for an immigrant work visa on Sugule's behalf by filing Form I-140, Immigrant Visa Petition for Alien Worker. Contemporaneous with AMS's filing of I-140, Sugule filed Form I-485, Application to Register Permanent Residence or Adjust Status, to obtain green cards for himself, his wife, and his four foreign-born children.

After four years of waiting, the DHS approved AMS's I-140 petition on August 12, 2007, only to issue a Notice of Intent to Revoke the approval three weeks later. The sudden change of heart was caused by the agency's discovery of three documents in which Sugule listed AMS as his asset. These documents caused the DHS to suspect Sugule owned AMS and therefore committed fraud on the DOL by failing to disclose his interest in the sponsoring entity when applying for labor certification. The three documents at issue, all signed by Sugule under the threat of perjury, were:

> (1) Uniform Residential Contract application submitted on January 11, 2005, to Guidance Residential, LLC in connection with Sugule's efforts to finance the purchase of a house. Sugule listed AMS as his employer and checked the adjacent "self-employed" box;

> (2) Surety Bond Application signed by Sugule on August 31, 2005, and submitted to Scott Insurance in connection with his efforts to obtain insurance for a new money transfer business. On the resume attached to the application, Sugule indicated he had been the owner of AMS since December 1997;

> (3) Personal Financial Statement signed by Sugule on the same day as the Surety Bond Application (August 31, 2005) and likewise submitted to Scott Insurance in an attempt to obtain insurance for a

money transfer business. On this statement, Sugule listed AMS among his assets and assessed its market value at $250,000.

In response to the DHS's notice, Sugule denied his ownership of AMS. He maintained the self-employed box on the Uniform Residential Contract application was checked by a bank employee in error and, although he admitted to misrepresenting his ownership of AMS on the two documents submitted to Scott Insurance, he explained he did so in a "desperate and foolish attempt to show [he] had a strong financial background."

To buttress his claims, Sugule submitted eighteen items of evidence reduced to the following categories:

- Sugule's own affidavit containing his explanation as described above.

- AMS's income tax returns for the 2002-06 period. The corporation's 2002-05 returns were signed by Omar Ali in the capacity of a president, and Ali was listed as the owner of 100 percent of AMS's stock on Schedule K-1 to the 2004 and 2005 returns. AMS's 2006 return was signed by Idiris Mohamud as its president, with the accompanying K-1 Schedule indicating Mohamud owned seventy-five percent of AMS's shares and Omar Ali the remaining twenty-five;

- Omar Ali's 2004-06 individual tax returns and Idiris Mohamud's 2006 individual tax return reporting income from AMS on respective Schedules E;

- Secretary of State Certificate of Assumed Name filed with the state of Minnesota on November 21, 1997, designating Abdi A. Mohamed as a person conducting business under AMS's name and Sugule as a contact person, and the Amendment to Certificate of Assumed Name filed with the state of Minnesota on November

-4-

6, 1998, showing Omar M. Ali as a person conducting business under AMS's name and Sugule still as a contact person;

• Application for Employer Identification Number signed on November 5, 1998, by Omar Ali as the sole proprietor of AMS, and another such application dated October 5, 2000, signed by Ali as a corporation's "principal officer, general partner, grantor, owner or trustor";

• Application for the Articles of Incorporation and the Certificate of Incorporation issued to AMS on April 12, 2000, listing Omar Ali as AMS's incorporator, and the Amendment of Articles of Incorporation filed with the state of Minnesota on March 24, 2006, and signed by Idiris Mohamud;

• Certificate of ownership for 1,000 AMS shares issued to Idiris Mohamud, AMS's President, on March 24, 2006;

• Affidavit of Abdi Mohamed stating he formed AMS on November 21, 1997, and sold it to Omar Ali in November 1998; affidavit of Omar Ali stating he purchased AMS from Abdi Mohamed in November 1998 and incorporated it on April 12, 2000; affidavit of Idiris Mohamud stating he purchased all outstanding shares of AMS's common stock (1,000 shares) from Omar Ali on March 26, 2006; and a letter from AMS's attorney, Walter M. Baker, stating the entire stock of AMS & Associates had belonged to Omar Ali until March 2006, at which time Idiris Mohamud became AMS's sole owner. All four individuals specifically disclaimed Sugule's ownership of AMS at any time;

• Letter from Guidance Residential, LLC, stating the self-employed box on the Uniform Residential Contract application was checked "as the result of a clerical error."

Sugule's voluminous submission notwithstanding, the DHS revoked the DOL's certification, which triggered the automatic revocation of the previously-approved

I-140 and denial of I-485 on March 11, 2008. The DHS compared the evidence referenced in its Notice of Intent to Revoke with the evidence provided by Sugule in his response and found the former to be more convincing in character. The agency discounted Sugule's explanation as "self-serving" and lacking persuasive value and credited Sugule's representations in the three documents referenced above. Appellants App'x at 11. The agency found the "evidence and circumstances in this record raise serious credibility questions," and Sugule "has not sustained" his burden of proof in the proceedings. Appellants App'x at 11, 13.

Next, Sugule filed Form I-290B, Notice of Appeal or Motion, which the DHS construed as a motion for reconsideration. On December 10, 2009, the DHS upheld its initial decision, using the occasion to expand its statement of reasons. The DHS stated that Sugule's evidence was not "reliable [and] objective"; that "it is not sufficient to submit stock certificates . . . without submitting the stock ledger demonstrating that those certificates represent all transactions that have transpired"; and that it is not "sufficient to submit self-prepared documents without evidence that they were actually submitted to the relevant authorities and boards." Appellees App'x at 62. The revocation was without prejudice to Sugule's filing of a new I-140 petition.

Sugule appealed to the district court. On March 31, 2010, the United States District Court for the District of Minnesota granted summary judgment in favor of the governmental defendants. The court concluded it was without jurisdiction to review the revocation of I-140 and denial of I-485, and found the DHS did not act arbitrarily or capriciously in invalidating the labor certification. The present appeal followed.

II

We first turn to the issue of jurisdiction. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996), precludes judicial review of the two categories of discretionary decisions by the DHS:

> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or

> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. § 1252(a)(2)(B).

The first of these categories forecloses our review of the denial of adjustment of status, see Toby v. Holder, 618 F.3d 963, 967 (8th Cir. 2010), and the second precludes our review of the revocation of the approved I-140 petition, see Abdelwahab v. Frazier, 578 F.3d 817, 821-22 (8th Cir. 2009). Both parties agree, however, that the jurisdictional bar of § 1252(a)(2)(B) does not deprive us of jurisdiction to review the DHS's invalidation of the labor certification. Under the recent Supreme Court decision in Kucana v. Holder, 130 S.Ct. 827 (2010), the "discretionary nature of the decision must be set forth in the statute itself to trigger the [jurisdictional] bar." Ginters v. Frazier, 614 F.3d 822, 827 (8th Cir. 2010). Because it is the agency regulation, not an act of Congress, that empowers the DHS to invalidate the labor certification, see 20 C.F.R. § 656.30(d), the court retains its jurisdiction to review invalidation of the labor certification.

In reviewing the merits of Sugule's claim, we look to both the DHS's initial ruling and its December 10, 2009, denial of Sugule's motion for reconsideration. Cf. Khrystotodorov v. Mukasey, 551 F.3d 775, 781 (8th Cir. 2008) (stating that, where the Board of Immigration Appeals supplants the reasoning of the immigration judge, the court reviews both). We review the district court's grant of summary judgment de novo, Nyari v. Napolitano, 562 F.3d 916, 920 (8th Cir. 2009), evaluating whether the DHS's "'action, findings, and conclusions [are] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" Falk v. United States ex rel. Dep't of Interior, 452 F.3d 951, 953 (8th Cir. 2006) (quoting 5 U.S.C. § 706(2)(A)). "The arbitrary and capricious standard is a narrow one that reflects the deference given to agencies' expertise within their respective fields." Henry v. U.S. Dep't of Navy, 77 F.3d 271, 272 (8th Cir. 1996). One aspect of the arbitrary and capricious review is an inquiry into whether the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Watkins v. Nat'l Transp. Safety Bd., 178 F.3d 959, 961 (8th Cir. 1999) (internal quotation marks and citations omitted). By contrast to legal questions, we review the agency's findings of fact under a deferential substantial-evidence standard. Sultani v. Gonzales, 455 F.3d 878, 881-82 (8th Cir. 2006) (stating that the agency's findings of fact are not supported by substantial evidence only where the evidence "not only supports a contrary conclusion but compels it").

Generally, it is the DOL's prerogative to evaluate conditions of the domestic labor market – i.e., whether there are able, willing, qualified, and available United States workers for the job offered to the alien and whether the alien's employment would have a negative effect on the wages and working conditions of similarly situated United States workers. K.R.K. Irvine, Inc. v. Landon, 699 F.2d 1006, 1009 (9th Cir. 1983). Once the DOL makes the necessary findings and certifies the

application, the only avenue for the DHS to invalidate it is upon finding "fraud or willful misrepresentation of a material fact involving the labor certification application." 20 C.F.R. § 656.30(d) ("[A]fter issuance, a labor certification is subject to invalidation by the DHS . . . upon a determination . . . of fraud or willful misrepresentation of a material fact involving the labor certification application."); see Madany v. Smith, 696 F.2d 1008, 1012 (D.C. Cir. 1983); Joseph v. Landon, 679 F.2d 113, 116 (7th Cir. 1982). To establish fraud necessary to revoke the DOL's certification in this case, the DHS relied on the finding that Sugule was AMS's owner, and he defrauded the DOL by failing to reveal his ownership of the sponsoring entity on Form ETA-750, Application for Alien Employment Certification. See Appellants App'x at 11 (alleging "the beneficiary . . . has implicitly signed under oath that he is not the owner of that company," and "[t]here is no evidence that during the certification process, the beneficiary revealed to the Department of Labor that he was the owner of the petitioning entity").

To the extent the DHS relied on Sugule's formal ownership of the corporation to establish fraud, its findings are not supported by the record. Although the DHS could also base its conclusions on Sugule's control of AMS short of formal ownership, nothing in its decision indicates the agency pursued that alternative theory. We cannot "blindly defer to an agency decision that is . . . unexplained," Qwest Corp. v. Boyle, 589 F.3d 985, 998 (8th Cir. 2009) (internal quotation marks and citation omitted), and will therefore focus on the only theory expressly expounded upon by the DHS: that of formal ownership.

Prior decisions of the agency reinforce the axiom that a corporation is owned by its shareholders. See In re Silver Dragon Chinese Rest., 19 I & N Dec. at 402-03; In re M, 8 I & N Dec. 24, 42-44 (BIA 1958). The DHS erred in imputing the entire ownership of AMS to Sugule, thereby disregarding the copious evidence that Sugule did not hold any AMS stock and the absence of any objective evidence to the contrary. The DHS also failed at explaining away the overwhelming evidence negating its position. Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto. Ins. Co., 463 U.S. 29, 51-54 (1983) (the agency's duty of reasoned decisionmaking includes the responsibility to explain away significant evidence undermining the agency's position).

The DHS's logic suffers from several flaws. Its reasons are conclusory, frequently boiling down to the mere "because I said so" explanation. To the extent the DHS identified specific issues with Sugule's evidence, all of them are vulnerable to serious criticisms. For example, the DHS professed to give preference to the quality of the evidence over its quantity, intimating that the eighteen documents produced by Sugule were not as trustworthy as the three documents marshaled by the agency. As the agency went about criticizing Sugule's evidence as "self-serving" and "self-prepared," however, it did not hesitate to hang its own hat on Sugule's equally self-serving and self-prepared representations in the bond application, the personal financial statement, and the residential contract application. In the same vein, while the DHS found the same three documents to be credible by virtue of having been signed under the threat of perjury, it readily disregarded sworn affidavits from AMS's three owners and a letter from AMS's counsel without any explanation.

The DHS's emphasis on the numerosity of documents supporting its conclusion appears even more artificial, given that the number of documents produced by Sugule outweighs the number of documents supporting the DHS's position by a six-to-one ratio. The same double-standard charge applies to the DHS's statement that the three documents in its arsenal were "signed months apart from each other and were submitted for different benefits." In contrast to Sugule's eighteen items of evidence spanning several years and covering the most relevant period – that preceding the issuance of the certification in 2003 – the three documents relied upon by the DHS were created on just two occasions, both years *after* the grant of the certification. Moreover, with respect to one of such occasions, Sugule produced a note from the bank assuming the blame for the checked self-employed box on Sugule's residential contract application. As with many other evidentiary items in the record, the DHS has not addressed the significance of this note anywhere in its discussion.

-10-

The DHS's point about a stock certificate not being sufficient "without submitting the stock ledger demonstrating that those certificates represent all transactions that have transpired" is vulnerable to similar criticisms. For one, this statement attacks one minor piece of evidence among many in Sugule's defense. More important, the DHS has not given a reasoned explanation or cited any authority for its insistence on the stock ledger as the exclusive method of proving ownership. Certainly, such insistence seems unduly formalistic in the face of multiple tax records, state business filings, and sworn affidavits from AMS owners and counsel uniformly disclaiming Sugule's interest in AMS throughout the company's existence.

We are also unpersuaded by the DHS's observation that various tax and incorporation records submitted by Sugule have low evidentiary value absent "evidence that they were actually submitted to the relevant authorities and boards." This statement disregards the reality that many of these records bear the filing stamps from the Minnesota Department of State and the Internal Revenue Service. Aside from being factually incorrect, this statement seems disingenuous, particularly where the agency chose to rely on the statements by Sugule which were never intended for, or filed with, any official bodies.

In sum, we are compelled to conclude on the record before us the agency's conclusion "runs counter to the evidence before the agency." Menorah Med. Ctr. v. Heckler, 768 F.2d 292, 295 (8th Cir. 1985) (internal citation and quotation marks omitted). It is unfathomable that a participant in any serious financial transaction would rely on representations of a similar type in ascertaining one's ownership of a business entity. Because each of the agency explanations is deficient on some level, as is the agency's own evidence, the DHS's decision failed to take the whole record into account and is not supported by substantial evidence. See Zheng v. Gonzales, 440 F.3d 76, 79-80 (2d Cir. 2006) (holding that, where none of the reasons for the immigration judge's adverse credibility finding was free from error, his finding was not supported by substantial evidence).

## IV

We reverse the judgment of the district court and remand for further proceedings.

_____