# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-1179

_____

Minnesota Telecom Alliance

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union;

Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1183

_____

Missouri Internet & Television Association

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

-------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*
_____

No. 24-1301
_____

Ohio Telecom Association

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of

Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1304

_____

Ohio Cable Telecommunications Association

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of

Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1309

_____

Florida Internet & Television Association

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*
_____

No. 24-1315
_____

Broadband Association of Alabama and Mississippi

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*
_____

No. 24-1317
_____

Benton Institute for Broadband & Society

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

------------------------------

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1319

_____

Media Alliance; Great Public Schools Now

*Petitioner*s

v.

Federal Communications Commission; United States of America

*Respondent*s

------------------------------

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1354

_____

Chamber of Commerce of the United States of America; Texas Association of Business; Longview Chamber of Commerce

*Petitioner*s

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1362
_____

Texas Cable Association

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union;

-10-

Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1364

_____

Texas Telephone Association

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

-11-

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1376
_____

NCTA-The Internet & Television Association; ACA Connects - America's Communications Association

*Petitioner*s

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of

Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*
_____

No. 24-1378
_____

USTelecom - The Broadband Association; Cellular Telecommunications Industry Association, The Wireless Association

*Petitioner*s

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society; Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia;

State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1411

_____

Wireless Infrastructure Association; Power & Communications Contractors Association; NATE: The Communications Infrastructure Contractors Association

*Petitioner*s

v.

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

-14-

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*

_____

No. 24-1444

_____

Wireless Internet Service Providers Association, also known as WISPA

*Petitioner*

v.

Federal Communications Commission; United States of America

*Respondent*s

-15-

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*
_____

No. 24-1509
_____

National Multifamily Housing Council, Inc.

*Petitioner*

v.

-16-

Federal Communications Commission; United States of America

*Respondent*s

Benton Institute for Broadband & Society;
Great Public Schools Now; Media Alliance

*Intervenor*s

------------------------------

TechFreedom; National Apartment Association; American Civil Rights Project; National Association of Manufacturers; International Center for Law & Economics; Information Technology & Innovation Foundation; State of Georgia; State of Alabama; State of Alaska; State of Arkansas; State of Florida; State of Idaho; State of Indiana; State of Iowa; State of Kentucky; State of Louisiana; State of Mississippi; State of Missouri; State of Montana; State of Nebraska; State of Ohio; State of South Carolina; State of South Dakota; State of Tennessee; State of Texas; State of Utah; Pacific Legal Foundation; Washington Legal Foundation; NTCA - The Rural Broadband Association

*Amici on Behalf of Petitioner*

Constitutional Accountability Center; NAACP Legal Defense and Educational Fund, Inc.; Asian Americans Advancing Justice; American Civil Liberties Union; Communications Workers of America; United Church of Christ, Office of Communication, Inc.; Public Knowledge; Electronic Privacy Information Center

*Amici on Behalf of Respondent*
_____

Petition for Review of an Order of the
Federal Communications Commission
_____

-17-

Submitted: September 25, 2024
Filed: May 6, 2026
_____

Before LOKEN, BENTON, and GRASZ, Circuit Judges.
_____

LOKEN, Circuit Judge.

In the Infrastructure Investment and Jobs Act ("IIJA"), Congress authorized $1.2 trillion in federal infrastructure funding. One Title of the IIJA, the Digital Equity Act of 2021, committed $65 billion towards broadband deployment[1] to bridge the "persistent digital divide" in subscriber access to affordable, high-speed internet across the United States, particularly in rural and underserved areas. 47 U.S.C. § 1701(2)-(5). The statute declares that, "insofar as technically and economically feasible subscribers should benefit from equal access to broadband internet access service within the service area of a provider of such service." § 1754(a)(1). It directs the FCC to adopt final rules to "facilitate equal access to broadband" by "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin." § 1754(b)(1).

In its final digital discrimination rule, see 47 C.F.R. § 16.3, the FCC adopted two theories of liability, disparate treatment and disparate impact. Disparate treatment refers to intentional discrimination. This part of the rule prohibits policies or practices intended to disproportionately affect consumers' access to broadband based on the statute's list of protected characteristics. It also covers unintentional discrimination. Disparate impact occurs when an entity maintains a facially neutral

___

[1]The Federal Communications Commission subdivides "[t]he radio spectrum . . . into nine frequency bands which [are] designated by progressive whole numbers." 47 C.F.R. § 2.101(a). The FCC assigns frequencies and frequency bands to licensed radio stations "in accordance with the Table of Frequency Allocations in § 2.106." 47 C.F.R. § 2102(a).

-18-

policy or practice or acts for a non-discriminatory reason, yet still disproportionally affects a protected group.

Telecommunications and broadband industry groups ("Industry Petitioners") challenged the FCC's disparate impact rule in six United States Courts of Appeals across the country, which have jurisdiction to review final orders of the Commission under 47 U.S.C. § 402(a) and 28 U.S.C. §§ 2342(1), 2343-2344. Pursuant to the random lottery procedure outlined in 28 U.S.C. § 2112(a)(3), the United States Judicial Panel on Multidistrict Litigation consolidated the various petitions for review in this court. A coalition of public interest groups ("Public Interest Petitioners") intervened on behalf of the FCC, but separately challenged portions of the rule, arguing they do not go far enough to combat digital discrimination. For the reasons discussed below, we grant in part Industry Petitioners' petition for review, deny Public Interest Petitioners' petition for review, and vacate the final rule.

## I. Statutory Overview.

Broadband generally refers to high-speed internet access. To enable users to access information over the internet, broadband providers use high-speed transmission technology including digital subscriber line; cable modem; fiber, fixed and mobile wireless; and satellite. The IIJA authorized significant investment in broadband infrastructure to eliminate barriers to broadband access, increase affordability, and fund digital literacy programs. The largest of the IIJA programs was the Broadband Equity, Access, and Deployment Program ("BEAD"), which provided $42.45 billion in federal grants for planning and infrastructure deployment. Another key initiative, the Affordable Connectivity Program ("ACP"), deployed $14.2 billion to offset broadband costs for low-income households.

The IIJA defines "broadband internet access service" as "the meaning given the term in section 8.1(b) of [the FCC's rules]." 47 U.S.C. § 1751. This regulation

-19-

defines the term as "[a] mass-market retail service by wire or radio that provides the capability to transmit data to and receive data from all or substantially all internet endpoints, including any capabilities that are incidental to and enable the operation of the communications service, but excluding dial-up internet access service." 47 C.F.R. § 8.1(b).  The definition encompasses "any service that the Commission finds to be providing a functional equivalent of the service described in the previous sentence or that is used to evade the protections set forth in this part."  Id.

IIJA § 60506, codified at 47 U.S.C. § 1754, declares "[i]t is the policy of the United States that . . . [broadband] subscribers should benefit from equal access to broadband internet access service" within a provider's service area.  47 U.S.C. § 1754(a)(1).  The statute defines equal access as "the equal opportunity to subscribe to an offered service that provides comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions."  Id. § 1754(a)(2).  It then sets forth rulemaking obligations assigned to the FCC:

> [T]he Commission shall adopt final rules to facilitate equal access to broadband internet access service, taking into account the issues of technical and economic feasibility presented by that objective, including—
>
> (1) preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin; and
>
> (2) identifying necessary steps for the Commissions to take to eliminate discrimination described in paragraph (1).

Id. § 1754(b). Congress further tasked the FCC with ensuring that "[f]ederal policies promote equal access to robust broadband internet access service by prohibiting deployment discrimination" and directed the Commission to develop model policies for state and local governments to implement.  Id. § 1754(c)-(d).  Finally, Congress

instructed the FCC to "revise its public complaint process to accept [discrimination] complaints from consumers or other members of the public." Id. § 1754(e).

## II. Regulatory History and the Final Rule.

In a Notice of Inquiry dated March 17, 2022, the Commission sought public comment on how it should interpret the language of § 60506, in particular whether "the term 'based on' require[s] discriminatory intent" and whether a disparate impact approach would be "permissible." It also raised the issue of applying a digital discrimination rule to entities other than broadband providers, asking, for example, whether "owners of multiple-tenant environments [could] digitally discriminate against those living and working in their buildings." In re Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination, 37 FCC Rcd. 4198, 4206, 4208 ¶¶ 22, 25 (2022) ("2022 Notice of Inquiry").

On December 22, 2022, after receiving "substantial comment" both in favor of and against disparate impact liability, the Commission issued a Notice of Proposed Rulemaking stating that it planned to adopt such an approach in defining digital discrimination. In re Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination, 37 FCC Rcd. 15274, 15279 ¶¶ 10, 12 (2022) ("2022 NPRM"). It sought further input on "whether and how to incorporate disparate impact or disparate treatment in our definition, either independently or in some combined formulation." Id. at 15282 ¶ 16.

The FCC ultimately incorporated both concepts when it released a report and order adopting a final digital discrimination rule on November 20, 2023. See In re Implementing the Infrastructure Investment and Jobs Act: Prevention and Elimination of Digital Discrimination, 38 FCC Rcd. 11440 (2023) ("Report and Order");

47 C.F.R. §§ 16.1-16.7. Industry and Public Interest Petitioners challenge various aspects of the final rule that we now review.

First, and most importantly, the FCC interpreted "digital discrimination of access" in § 60506 to encompass both disparate impact and disparate treatment. In the Report and Order, the Commission concluded that § 60506 "focuses on the impact of a policy or practice on the consumer's chance or right to obtain service rather than intent," and found "little or no evidence" that intentional discrimination causes impediments to broadband access. 38 FCC Rcd. at 11457 ¶ 38, 11459 ¶ 41. Accordingly, the final rule accounts for both theories of liability, 47 C.F.R. § 16.3(b):

> It shall be unlawful for any broadband provider, or covered entity as described in this part, to adopt, implement or utilize policies or practices, not justified by genuine issues of technical or economic feasibility, that differentially impact consumers' access to broadband internet access service based on their income level, race, ethnicity, color, religion, or national origin or are intended to have such differential impact.

Second, the rule broadly defines "covered entities" to include not only broadband service providers, but also "entities that provide services that facilitate and affect consumer access to broadband." 47 C.F.R. § 16.2. A non-exhaustive list of covered entities includes contractors retained by broadband providers, entities "facilitating or involved in" providing broadband, and those "maintaining and upgrading network infrastructure." The definition of covered entity ends with a catchall provision that includes "[e]ntities that otherwise affect consumer access to broadband internet access service." Id. The Report and Order concluded that various entities outside the communications industry could violate the rules by maintaining policies or practices that differentially impact access to broadband. 38 FCC Rcd. at 11484 ¶ 87.

Third, the rule establishes a burden-shifting framework through which the FCC will assess claims against covered entities under either a disparate treatment or disparate impact theory of liability. If the FCC finds a covered entity's policies or practices are intentionally discriminatory or have discriminatory effects, the entity can escape liability by demonstrating that the policy or practice is "justified by genuine issues of technical or economic feasibility." 47 C.F.R. § 16.5(a)-(b). Covered entities have the burden of proving technical or economic feasibility by a preponderance of the evidence. Id. § 16.5(d). The rule notes that this "may include proof that available, less discriminatory alternatives were not reasonably achievable at the time the policy or practice was adopted, implemented, or utilized." Id. § 16.5(c). The Commission then determines, on a case-by-case basis, whether genuine issues of technical or economic feasibility justify the discriminatory policy in question. Id. § 16.5(e).

Fourth, the Commission asserted broad enforcement authority. While the rule itself simply notes that potential violations may be referred to the FCC's Enforcement Bureau, the Report and Order explained that the Commission will "bring to bear its full suite of available remedies, including the possibility of monetary forfeitures." 38 FCC Rcd. at 11508 ¶ 141; 47 C.F.R. § 16.6.

Fifth, in accordance with § 1754(e), the FCC updated its complaint procedures "to accept complaints from consumers or other members of the public that relate to digital discrimination." Specifically, the Commission determined it would accept informal complaints of digital discrimination and pursue Commission-initiated investigations, but declined to adopt a structured formal complaint process. Report and Order, 38 FCC Rcd. at 11481 ¶ 81, 11520 ¶ 166. The FCC's usual framework for complaints against common carriers provides that a consumer can file an informal complaint with the Commission for no fee. See id. at 11498 ¶ 110. The Commission then transmits the complaint to the consumer's service provider, typically requiring a response. Informal complaints do not generate written Commission orders. Rather,

they are meant to "facilitate[] a conversation between the consumer and their [sic] provider to address the consumer's issues." Id. at 11497 ¶ 107 n.373; see 47 C.F.R. §§ 1.716-.718. In some contexts, the FCC then allows consumers who are unsatisfied with the resolution of an informal complaint to file a formal complaint. Formal complaint proceedings are more akin to litigation and involve pleadings, responsive motions, and discovery. The Commission resolves them by written order. See 47 C.F.R. §§ 1.720-.740.

Sixth, the FCC adopted a presumption of compliance with its digital discrimination rule for policies and practices that comply with the non-discrimination requirements of related broadband programs. These include the FCC's Universal Service Fund ("USF") high-cost program and the IIJA's BEAD program. Report and Order, 38 FCC Rcd. at 11508 ¶ 142. In establishing the BEAD program, Congress required that eligible entities receiving federal grants stipulate in contracts with any subgrantees that funds will be distributed and used in "an equitable and non-discriminatory manner." 47 U.S.C. § 1702(g)(2)(C)(i)-(ii). The Commission explained that this program "exist[s] to remedy current inequities in broadband deployment and [is] consistent with section 60506 and our rules adopted today." Report and Order, 38 FCC Rcd. at 11508 ¶ 142. The Public Interest Petitioners argue the Commission failed to provide a reasonable explanation for this presumption of compliance.

The Commission adopted the final rule in a 3-2 vote. Dissenting Commissioner Brendan Carr criticized "the FCC's erroneous decision to read a disparate impact standard into a disparate treatment statute," arguing that the statutory text of § 60506 in no way authorized disparate impact liability. Report and Order, 38 FCC Rcd. at 11662. He warned that the rule would allow the Commission to "impose potentially unbounded liability if the agency finds that some act or even failure to act happened to result in a disparate impact based on the FCC's own judgment." Id. Dissenting Commissioner Nathan Simington criticized the rule's

technical or economic feasibility defense. He argued that protection against disparate impact liability in other contexts is based on legitimate, nondiscriminatory interests, whereas the final rule's limited formulation requires broadband providers to sacrifice profitability in order to advance the Commission's digital equity goals. Id. at 11671.

Within ten days of publication of the Report and Order, broadband industry groups and civil rights organizations filed petitions for review in the United States Courts of Appeals for the Fifth, Sixth, Eighth, Ninth, Eleventh, and District of Columbia Circuits. Invoking the procedure outlined in 28 U.S.C. § 2112(a)(3), the FCC notified the United States Judicial Panel on Multidistrict Litigation of these multiple petitions for review of the same FCC action. Then, via its random selection procedure, the Panel designated this court for consolidation of the various petitions for review.

## I. Discussion

**A. The Petitioner Group Challenges.** These consolidated petitions for review separately challenge the FCC's final rule. Industry Petitioners seek to set aside the rule in its entirety; Public Interest Petitioners oppose vacating the rule but challenge two of its specific aspects.

The Industry Petitioners' principal argument is that § 60506 does not authorize the FCC to impose disparate impact liability, pointing to the plain text of the statute and the statutory context. They emphasize Congress's use of the language "discrimination . . . based on" protected characteristics in § 60506(b)(1) signal discriminatory intent liability. Furthermore, Industry Petitioners claim that the statute does not impliedly authorize disparate impact liability, as the language departs significantly from the statutory formulation for disparate impact recognized by the Supreme Court in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 576 U.S. 519 (2015). The Industry Petitioners urge us to

apply the major questions doctrine to invalidate the FCC's interpretation of the statute. This doctrine requires an administrative agency to point to "clear congressional authorization" when taking action in "extraordinary cases" where the "history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." West Virginia v. EPA, 597 U.S. 697, 721, 723 (2022) (quotations omitted).

The Industry Petitioners challenge other aspects of the final rule. They argue the Commission exceeded its statutory authority by adopting a rule covering entities other than internet service providers. They contend this assertion of authority implicates the major questions doctrine, and argue that imposition of monetary penalties is not clearly authorized by IIJA § 60506. In addition, they argue that the FCC lacks statutory authority to adopt the rule's burden-shifting framework, which departs from the accepted framework in Inclusive Communities; the agency failed to publish the required preliminary regulatory analysis or provide a supplemental notice; and the final rule should be set aside as arbitrary and capricious under the Administrative Procedure Act ("APA") because the agency failed to explain its deviation from the Inclusive Communities burden-shifting framework and failed to "adequately consider and justify the rule's full costs."

The Public Interest Petitioners, as intervenors, support the FCC's rule as challenged by Industry Petitioners but argue the FCC violated the APA by arbitrarily and capriciously (i) not allowing digital discrimination complainants to file formal complaints, and (ii) including a safe harbor provision for entities receiving BEAD funding after failing to provide adequate notice it was considering this provision during the notice-and-comment period and without providing a reasonable explanation for this presumption of compliance.

**B. Standard of Review.** Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." Id. § 706.

"Congress in 1946 enacted the APA as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." Loper Bright Enters. v. Raimondo, 603 U.S. 369, 391 (2024) (quotation omitted). In Loper Bright, the Supreme Court overruled Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), under which courts deferred to permissible agency interpretations of statutes that were ambiguous or silent on a particular issue. The Court interpreted APA § 706 as "mak[ing] clear that agency interpretations of statutes . . . are *not* entitled to deference." Loper Bright, 603 U.S. at 392 (emphasis in original). Thus, a reviewing court has the responsibility "to decide whether the law means what the agency says." Id. (quotation omitted). This requires courts to "exercise independent judgment in determining the meaning of statutory provisions." Id. at 394. The Court clarified, however, that reviewing courts may still "seek aid from the interpretations of those responsible for implementing particular statutes" and pay "[c]areful attention to the judgment of the Executive Branch." Id. at 394, 412-13. The task of reviewing courts is to "use every tool at their disposal to determine the best reading of the statute." Id. at 400. We turn to "traditional tools of statutory construction" in determining "whether an agency has acted within its statutory authority." Id. at 403, 412.

**C. Specific Claims.** We review issues of statutory interpretation *de novo* "beginning with the statute's plain language, giving words the meaning that proper

grammar and usage would assign them." United States v. Lester, 92 F.4th 740, 742 (8th Cir. 2024) (quotation omitted). "If the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." United States v. Jungers, 702 F.3d 1066, 1069 (8th Cir.) (cleaned up) (quotation omitted), cert. denied, 571 U.S. 866 (2013). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." Dolan v. U.S. Postal Serv., 546 U.S. 481, 486 (2006). We review an agency's compliance with the procedural requirements of the APA *de novo* "because compliance 'is not a matter that Congress has committed to the agency's discretion.'" United States v. Brewer, 766 F.3d 884, 887-88 (8th Cir. 2014), quoting Iowa League of Cities v. EPA, 711 F.3d 844, 872 (8th Cir. 2013).

**(1) Disparate Impact Liability.** Some federal anti-discrimination statutes expressly authorize the imposition of disparate impact liability. In addition, the Supreme Court has held that the provisions of three federal statutes authorize disparate impact liability by implication -- Title VII of the Civil Rights Act of 1964 ("Title VII"), the Age Discrimination in Employment Act of 1967 ("ADEA"), and the Fair Housing Act ("FHA"). Thus, under Loper Bright, we must determine whether § 60506 of the IIJA is another federal statute that authorizes disparate impact liability by implication. This requires careful comparison of the language in § 60506 with the Supreme Court's textual analyses of these three other statutes. We conclude the language the Court emphasized in permitting disparate impact discrimination claims without express statutory authorization is noticeably absent from § 60506. Accordingly, we conclude that Congress did not authorize disparate impact liability and vacate the final rule.

**a. The Supreme Court's Disparate Impact Precedents.** Section 703(a)(2) of Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to

limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(2). In Griggs v. Duke Power Co., 401 U.S. 424 (1971), the Supreme Court held that the statute "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation" because Congress "directed the thrust of [§ 703(a)(2)] to the consequences of employment practices, not simply the [employer's] motivation." However, the Court concluded, this disparate impact liability is limited by a "business necessity" inquiry -- an employer can avoid liability by showing that the challenged requirement has a "manifest relationship" to job performance. Id. at 431-32.

Section 4(a)(2) of the ADEA provides, "[i]t shall be unlawful for an employer . . . to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2). In Smith v. City of Jackson, 544 U.S. 228 (2005), a plurality of the Court agreed that the ADEA also authorizes disparate impact claims. The plurality focused on the text of § 703(a)(2) of Title VII as analyzed in Griggs and the similar formulation in the ADEA, specifically the language "otherwise adversely affect" in § 4(a)(2), concluding that "the text focuses on the *effects* of the action on the employee rather than the motivation for the action of the employer." Smith, 544 U.S. at 236. Thus, ADEA disparate impact liability is permissible.

Third, and most recently, in Inclusive Communities, the Court held that disparate impact claims are cognizable under sections §§ 804(a) and 805(a) of the Fair Housing Act. 576 U.S. at 533-34, 545. Section 804(a) provides that it is unlawful to "refuse to sell or rent after the making of a bona fide offer, or to refuse

to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). Under the Court's analysis in Griggs and Smith, "antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose." Id. at 533. The key language in § 804(a) -- "otherwise make unavailable" -- is "equivalent in function and purpose" to the "otherwise adversely affect" language that Congress used in both Title VII and the ADEA. This "results-oriented language" refers to "consequences of an action rather than the actor's intent," and thus supports reading disparate impact liability into the statute. Id. at 534.

The nearly identical structures of the relevant Title VII, ADEA, and FHA provisions reinforced the Court's conclusion. Each statute begins with a prohibition on intentional discrimination and ends with a "catchall" provision looking to consequences not intent. Id. at 535; see, e.g., 29 U.S.C. § 623(a)(2) (ADEA). Use of the "otherwise" formulation is "a shift in emphasis from an actor's intent to the consequences of his actions." Id. That Congress used "otherwise make unavailable" in the FHA, but "otherwise adversely affect" in Title VII and the ADEA was unimportant, as the exact same language would have produced an "awkward and unclear" sentence. Id.

The Court also held § 805(a) of the FHA authorizes disparate impact liability. That section makes it unlawful "for any person or other entity whose business includes engaging in real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction." 42 U.S.C. § 3605(a). While the "otherwise" phrase in § 804, Title VII, and the ADEA is absent in § 805(a), the Court noted that it "has construed statutory language similar to § 805(a) to include disparate-impact liability," citing its

interpretation of "discrimination" in Board of Education of the City School District of New York v. Harris, 444 U.S. 130 (1979). Inclusive Communities, 576 U.S. at 534.

**b. The Relevant IIJA Provisions.** Section 60506(b)(1) of the IIJA directs the FCC to adopt final rules "preventing digital discrimination of access based on income level, race, ethnicity, color, religion, or national origin." We agree with the Industry Petitioners that the plain meaning of this text, informed by precedent and its statutory context, does not authorize the FCC to impose disparate impact liability. Beginning with the plain meaning of discrimination, dictionary definitions suggest an element of intent. See Discrimination, American Heritage Dictionary 516 (5th ed. 2011) ("[t]reatment or consideration based on class or category"); Discrimination, New Oxford American Dictionary 497 (3rd ed. 2010) ("the unjust or prejudicial treatment of different categories of people or things").

The Supreme Court has repeatedly stated that the "normal definition" of discrimination is "differential treatment." Babb v. Wilkie, 589 U.S. 399, 400 (2020), quoting Jackson v. Birmingham Bd. of Educ., 544 U.S. 167, 174 (2005). As used in the anti-retaliation provision of Title VII, the Court explained, "[n]o one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006). And in the context of sexual orientation discrimination under Title VII, this term means "intentionally treat[ing] a person worse because of sex." Bostock v. Clayton Cnty., 590 U.S. 644, 658 (2020). Most recently, interpreting the meaning of "discriminate against" in the whistleblower protection provision of the Sarbanes-Oxley Act of 2002, the Court held that the term requires "intent to take some adverse employment action against the whistleblowing employee." Murray v. UBS Sec., LLC, 601 U.S. 23, 35 (2024).

-31-

The IIJA mandates the adoption of final rules that facilitate equal access by "preventing digital discrimination of access based on" the protected characteristics in § 60506(b)(1). The Industry Petitioners emphasize that "based on" is the equivalent of "because of," a statutory term often read to require discriminatory intent. The Commission responds that Title VII, the ADEA, and the FHA also prohibit discrimination "because of" enumerated characteristics, but are construed to encompass disparate impact liability.

"In common talk, the phrase 'based on' indicates a but-for causal relationship and thus a necessary logical condition." Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 63 (2007); see Bostock, 590 U.S. at 656 ("The ordinary meaning of 'because of' is 'by reason of' or 'on account of.'"); Memphis St. Acad. Charter Sch. at J.P. Jones v. Phila. Sch. Dist., No. 25-2574, 2026 WL 934190 at *5 (3d Cir. Apr. 7, 2026) (interpreting a provision of the Pennsylvania Constitution). Here, construing the use of "based on" in the context of a statute prohibiting "discrimination," the plain text of § 60506 of the IIJA permits imposing only disparate *treatment* discrimination.

We further agree with Industry Petitioners that § 60506 lacks the "results-oriented" language that would signal Congress's intent to cover disparate impact claims. The statute noticeably omits the "otherwise adversely affect" or "otherwise make unavailable" formulations of Title VII, the ADEA, and the FHA. This language "is of central importance" to finding that a statute encompasses disparate impact liability. Inclusive Communities, 576 U.S. at 534. Without it, § 60506(b)(1) lacks any language shifting the emphasis of the prohibition from "preventing digital discrimination" to a phrase "looking to consequences, not intent." Id. at 535.

In general, we "presume that Congress is knowledgeable about existing law pertinent to interpreting the legislation it enacts." Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85 (1988). We also "assume that, when Congress enacts statutes,

-32-

it is aware of relevant judicial precedent." Merck & Co., Inc. v. Reynolds, 559 U.S. 633, 648 (2010). The directive in § 60506 to prevent discrimination, without an additional effects-focused language, strongly implies Congress did not intend disparate impact liability.

We acknowledge, as the Commission argues, that the Supreme Court in Inclusive Communities interpreted FHA § 805(a), which does not include an "otherwise" transition phrase, to encompass disparate impact liability. 576 U.S. at 533-35; see 42 U.S.C. § 3605(a). But the Court focused predominately on the language of the neighboring FHA provision, § 804(a), which does include the results-oriented "otherwise" phrase. The limited discussion of § 805(a) likened the provision's use of the term "discriminate" to the use of "discrimination" in § 706(d)(1)(B) of the 1972 Emergency School Aid Act ("ESAA"), which the Court interpreted in Harris. This provision denied federal funding to an educational agency whose policies or practices resulted in "the disproportionate demotion or dismissal of instructional or other personnel from minority groups . . . or otherwise engaged in discrimination based upon race, color, or national origin in the hiring, promotion, or assignment of employees." 444 U.S. at 132-33, quoting 20 U.S.C. § 1605(d)(1)(B) (repealed 1978). The Court held that the clause relating to demotion and dismissal focused on impact rather than intent and concluded that the "closely connected" clause relating to hiring, promotion, and assignment of employees should be read the same way even though its "based upon" language "might be said to possess an overtone of intent." Id. at 138-43. The Court relied on the statute's structure, statements of purpose and policy, and legislative history to overcome "less than careful draftsmanship." Id. at 138, 140-46.

The Court in Inclusive Communities also focused on 1988 FHA amendments which added three exemptions from liability to § 805(a), including an exemption provision for property appraisers. See 42 U.S.C. § 3605(c). Before the amendment,

the federal courts of appeals had recognized the FHA as prohibiting disparate impact. If disparate impact claims had been precluded by the statute, in the Court's view, this amendment would "merely restate black-letter law" -- that appraisers can take into account factors other than the protected characteristics in § 805(a). Instead, the amendment created a new exception to disparate impact liability for real estate appraisers making decisions based on considerations other than the protected categories. Id. at 537-38. This inclusion of a new exemption supported the Court's conclusion that Congress intended § 805(a) to encompass disparate impact liability, despite lacking the "otherwise" formulation of § 804, Title VII, and the ADEA.

Here, IIJA § 60506(b)(1) contains no "otherwise adversely affect" language pointing to disparate impact liability. In addition, there are no amendments suggesting the existence of disparate impact liability which the Court in Inclusive Communities found "of crucial importance" to finding the intent to impose disparate impact liability in the FHA. 576 U.S. at 535. Section 60506 generated no legislative history on the subject of disparate impact liability. Consequently, there is no apparent reason for Congress not to use the judicially recognized "otherwise adversely affect" formulation other than to confirm its intent *not* to authorize the imposition of disparate impact liability.

**c. Additional FCC Textual Contentions.** We find the FCC's remaining textual arguments unpersuasive. The Commission and the Public Interest Petitioners first argue that the statute does in fact include results-oriented language signaling disparate impact liability. The Commission notes that the word "prevent" in § 60506(b)(1)'s directive to adopt rules has been defined as meaning "to render (an *intended, possible, or likely* action or event) impractical or impossible by anticipatory action." Fowler v. United States, 563 U.S. 668, 675 (2011), quoting The Oxford English Dictionary Online (Mar. 2011). Therefore, § 60506(b)(1) grants it broad implied authority to regulate any action that affects consumer access to broadband

based on the characteristics enumerated in the statute. But this reading ignores what the FCC is tasked with preventing -- *discrimination*, whose ordinary meaning refers to intentional action. Second, the Commission argues the word "eliminate" in § 60656(b)(2) grants it broad authority to eliminate all forms of disparate treatment and disparate impact discrimination. But this provision is future-oriented. It instructs the FCC to adopt final rules "identifying necessary steps" it can later take to root out the digital discrimination described in § 60656(b)(1).

Third, the Commission argues that the statute's use of the word "opportunity" implies authority to impose disparate impact liability. Section 60506 directs the FCC to adopt final rules to "facilitate equal access to broadband." 47 U.S.C. § 1754(b). The statute's statement of policy defines "equal access" as "the equal *opportunity* to subscribe" to broadband services. § 1754(a)(2) (emphasis added). Noting that Title VII and the ADEA both protect against the denial of employment "opportunities," the Commission argues this language refers to consequences of actions and thus signals authority to impose disparate impact liability. We disagree. The word "opportunities" in Title VII and the ADEA was not key language signaling disparate impact liability in <u>Griggs</u> and in <u>Smith</u>. Rather, "opportunities" comes before the shift to address disparate impact, marked by the phrase "otherwise adversely affect." In § 703(a) of Title VII, the term "deprive or tend to deprive any individual of employment *opportunities*" is part of the initial disparate treatment prohibition. 42 U.S.C. § 2000e–2(a)(2) (emphasis added). The statute then shifts its focus to a distinct disparate impact prohibition -- "or otherwise adversely affect his status as an employee." This is the "results-oriented language" referring to "consequences of an action rather than the actor's intent" that supported reading disparate impact liability into Title VII. <u>Inclusive Communities</u>, 576 U.S. at 534. The same is true of the ADEA prohibition. <u>See</u> 29 U.S.C. § 623(a)(2). Use of the word "opportunity" in the IIJA statement of policy does not provide that support.

The Commission further argues that § 60506(b)(1) addresses "preventing digital discrimination" without reference to a specific actor whose discriminatory intent can be assessed, unlike § 4(a) of the ADEA and § 703(a) of Title VII, which refer to unlawful conduct by a specific actor, an "employer." But this general "discrimination" language is not a consistent indicator of the type of discrimination Congress intends to prohibit. For example, § 804(a) of the FHA uses the passive construction, "it shall be unlawful . . . [t]o refuse to sell or rent," while § 805(a) specifies actors whose discrimination it seeks to prevent: "any person or other entity whose business includes engaging in residential real estate-related transactions." 42 U.S.C. §§ 3604(a), 3605(a). Inclusive Communities held that both provisions encompass disparate impact claims. 576 U.S. at 545. By contrast, § 1981 of the Civil Rights Act of 1866, which provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens," 42 U.S.C. § 1981(a), has been construed to encompass only claims of intentional discrimination based on race. See Saint Francis Coll. v. Al-Khazraji, 481 U.S. 604, 613 (1987).

Finally, the FCC argues that reading § 60506(b) to cover only disparate treatment would render superfluous the statute's directive to develop rules "taking into account the issues of technical and economic feasibility," 47 U.S.C. § 1754(b), because the Report and Order concluded there is scant evidence that broadband access disparities result from intentional discrimination rather than by neutral business decisions that have discriminatory effects. Report and Order, 38 FCC Rcd. at 11464 ¶ 47, 11471 ¶ 63. We disagree for two reasons.

First, the feasibility consideration will play a significant role in resolving disparate treatment claims the Commission intends to resolve by applying the multi-factor inquiry prescribed in Arlington Heights v. Metropolitan Housing Corp., 429 U.S. 252 (1977), "to complaints involving treatment of a large group of persons,

including but not limited to deployment, upgrade, and large-scale service matters alleged to have been motivated by prohibited discrimination," and by using the burden-shifting analysis established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "for investigating complaints as to selection for benefits, special deals, or even qualification for broadband service." Report and Order, 38 FCC Rcd. at 11506 ¶ 135, 11507 ¶ 136. Indeed, the FCC acknowledges that technical and economic feasibility issues are relevant to allegations of intentional digital discrimination based on indirect evidence. Id. at 11506-07 ¶¶ 135-37.

Second, § 60506(b) does not only direct the FCC to adopt a final rule aimed at "preventing digital discrimination." 47 U.S.C. § 1754(b)(1). It also requires the Commission to adopt rules "identifying necessary steps for the Commission[] to take to eliminate discrimination described in [§ 60506(b)(1)]." Id. § 1754(b)(2). Such rules must take into account issues of technical or economic feasibility. The Report and Order cited proposals for further action received during the notice-and-comment period, including action to address digital discrimination on tribal lands and organizational changes to help the FCC combat digital discrimination. Other proposals focused on spectrum policy, broadband speed benchmarks, and improving broadband data collection maps. The Report and Order explained that the Commission would continue to consider these proposals. Report and Order, 38 FCC Rcd. at 11523-25 ¶ 171. For example, the Commission will continue to evaluate its data collection requirements, see id. at 11522-23 ¶ 170, and the statute requires the FCC "to tak[e] into account the issues of technical and economic feasibility presented by that objective." § 1754(b).

Based on the plain text of the statute and its context, we conclude that the governing instruction in Inclusive Communities -- that "disparate-impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and

dynamic free-enterprise system" -- applies to IIJA § 60506. 576 U.S. at 533. Accordingly, the Commission exceeded its statutory authority in adopting a final rule authorizing the imposition of disparate impact liability.[2]

**(2) The Covered Entities Issue.** The Industry Petitioners argue the FCC exceeded its statutory authority when it extended the final rule to cover entities other than broadband providers. We agree. The text of § 60506 refers to only two parties involved in the provision of broadband service: broadband providers and service subscribers. The statute's statement of policy declares that "*subscribers* should benefit from equal access to broadband internet access service within the *service area of a provider* of such service." 47 U.S.C. § 1754(a)(1) (emphasis added). It then defines equal access as "the equal opportunity to *subscribe* to an offered service." § 1754(a)(2) (emphasis added). The next subsection instructs the Commission to "adopt final rules to facilitate equal access," § 1754(b)(2), and § 1754(c) directs the Commission and the Attorney General to "ensure that Federal policies promote equal access." Congress also directed the FCC to "develop model policies and best practices that can be adopted by States and localities to ensure that *broadband internet access service providers* do not engage in digital discrimination." § 1754(d) (emphasis added). Finally, the policy statement calls for "comparable speeds, capacities, latency, and other quality of service metrics in a given area, for comparable terms and conditions," all of which are specific aspects of broadband service that providers themselves control. § 1754(a)(2).

With this clear statutory focus, the FCC acknowledged that it was "not explicitly tasked with regulating entities outside the communications industry."

---

[2]Given our holding that the Commission lacks statutory authority under § 60506 to implement a disparate impact rule, we need not reach the Industry Petitioners' major questions doctrine contention.

-38-

Report and Order, 38 FCC Rcd. at 11484 ¶ 87. But it nonetheless declined to exclude any entities from coverage and concluded, "our rule is clear that any entity that meaningfully affects access to broadband internet service is subject to our digital discrimination of access rules." Id. at 11485 ¶ 88. As dissenting Commissioner Carr described this decision:

> Landlords are now covered, construction crews are now covered, unions are now covered, marketing agencies are now covered, banks are now covered, the government itself is now covered . . . liable under [these rules] for both acts and omissions. Congress never authorized the FCC to regulate all of these industries or entities. So, to everyone that will be subject to FCC regulation for the first time ever, welcome, I hope you have good lawyers.

Id. at 11659.

We agree with the Industry Petitioners there is no textual basis for extending a statute focused on the subscriber-provider relationship to the acts and omissions of entities such as local governments and broadband infrastructure owners, as the Report and Order contemplates. See 38 FCC Rcd. at 11484-85 ¶ 88. Local governments, for example, may play a secondary role in the provision of broadband access service when they regulate with local franchises and manage use of the public right-of-way. But they do not, as § 60506 specifies, provide the opportunity to "subscribe to an offered service," or impose "terms and conditions" for "subscribers." The same goes for infrastructure owners, who provide the infrastructure necessary for providers to offer service, but are not part of the subscriber-provider relationship.

In response, as it does in defending the final rule's disparate impact liability, the Commission points to § 60506(b)'s focus on prohibited acts and their effects, without reference to a specific actor. But we must read § 60506(b) in context. Its

instruction to adopt rules to "facilitate equal access" incorporates the definition of equal access from § 60506(a), which contains language specific to subscribers and providers, the relevant actors Congress sought to regulate.

The Commission also notes that, while § 60506(b) does not mention providers, § 60506(d), the state and local policies provision, specifically references "broadband internet access service providers." Absent this express reference to providers, the FCC argues, § 60506(b) should apply much more broadly. We disagree. Congress expressly naming broadband providers in § 60506(d) does not suggest it intended other provisions to extend more broadly to entities never before regulated by the FCC. It is illogical that Congress would intend that the FTC adopt anti-discrimination rules covering a wide range of entities outside the broadband industry, but then limit its request for model state and local policies to broadband providers alone. The Commission argues Congress may have intended that state policies address the "mine-run" of cases and its federal rules to "capture new or unusual cases." But this interpretation of one textual variation reads far too much into a statute focused on providers and subscribers.

The Commission also relies on precedent from other contexts where courts have recognized the FCC's authority to regulate entities other than communications providers. Under the Federal Communications Act of 1934, the FCC regulates "all interstate and foreign communication by wire or radio" and "all persons engaged within the United States in such communication." 47 U.S.C. § 152(a). But a grant of authority does not mean the FCC "possesses *plenary* authority to act within a given area simply because Congress has endowed it with some authority to act in that area." Am. Libr. Ass'n v. FCC, 406 F.3d 689, 708 (D.C. Cir. 2005) (quotation omitted). The Commission cites Building Owners & Managers Ass'n International v. FCC, 254 F.3d 89, 93-97 (D.C. Cir. 2001), which upheld the extension to leased property (and thus landlords) of an FCC rule prohibiting restrictions on direct-to-home satellite

services. Although the Communications Act did not "explicitly grant the Commission jurisdiction over the real estate industry," the court reasoned that Congress granted the FCC nearly exclusive jurisdiction to regulate direct-to-home satellite services, and building owners "directly furnishe[d]" the restrictions Congress sought to prohibit. Id. at 94-96. Here, § 60506 lacks any language conferring exclusive jurisdiction over a specific area of broadband services and no open-ended authorization to cover a wide range of entities in "areas that are tangential to the Commission's jurisdiction." Id. at 96. In addition, the decision in Building Owners was anchored in Chevron deference, which no longer applies, and legislative history that is missing in the IIJA. Id. at 94-95.

The Commission also points to cases holding that non-housing providers, such as insurers and appraisers, who "make unavailable or deny" housing based on protected characteristics are covered under the FHA. See NAACP v. Am. Fam. Mut. Ins., 978 F.2d 287 (7th Cir. 1992); Hanson v. Veterans Admin., 800 F.2d 1381 (5th Cir. 1986). However, these Chevron era cases were based on deference to an agency's construction of a "sufficiently pliable" statute, Am. Fam. Mut. Ins., 978 F.2d at 300, and consideration of a housing practice with a "direct effect" on buyers' ability to purchase a home. Hanson, 800 F.2d at 1385. The relationships between broadband providers and the service industries the FCC seeks to regulate in the final discrimination rule are far more attenuated. Moreover, they lack IIJA textual support and the "robust causality" required to authorize the imposition of disparate impact liability. Inclusive Communities, 576 U.S. at 542; see Report and Order, 38 FCC Rcd. at 11514-15 ¶ 157, 11484 ¶ 87.

The breadth of the FCC's assertion of liability is clear: "our rule is . . . that any entity that meaningfully affects access to broadband internet service is subject" to liability. Id. at 11485 ¶ 88. The final rule gives entities other than broadband service providers no clear guidance on what policies and practices might actually subject

-41-

them to liability, which is likely to stifle expansion and innovation of broadband services, defeating the IIJA's core purpose. See Inclusive Communities, 576 U.S. at 542. The agency asks for a "trust us" approach which provides little comfort to regulated parties facing enormous non-compliance penalties.

We conclude the Commission exceeded its statutory authority by adopting such a broad definition of covered entities. Thus, the agency exceeded its statutory authority in two respects that are the core of the final rule -- disparate impact liability and the definition of covered entities. We therefore vacate the final rule in its entirety, leaving the FCC with an unfinished obligation to "adopt final rules to facilitate equal access to broadband internet access service" in compliance with 47 U.S.C. § 1754.

**(3) Other Issues.** The Industry Petitioners and the Public Interest Petitioners raise serious challenges to other provisions of the final rule that the parties and their supporting amici have extensively briefed and argued. Our decision to vacate the entire final rule and the Article III restriction limiting our jurisdiction to deciding "Cases and Controversies" require us to decide whether these other issues are still "ripe" for our review and justiciable. We conclude they are not.

**(a) Remedies.** The Industry Petitioners argue the Commission exceeded its authority under IIJA § 60506 by authorizing Commission enforcers and private complainants to be awarded "its full suite of available remedies, including the possibility of monetary forfeitures," for disparate impact violations. Report and Order, 38 FCC Rcd. at 11508 ¶ 141. The FCC's general authority to impose forfeiture penalties derives from § 503 of the Communications Act, which applies to violations of the Communications Act and other specified provisions. 47 U.S.C. § 503(b)(1). Unlike other IIJA provisions which were incorporated into

-42-

the Communications Act, § 60506 was not.[3] Lacking express incorporation of § 60506 into the Communications Act, the Commission argues that the language of § 60506, standing alone, authorizes it to pursue Communications Act remedies.

Industry Petitioners and the FCC again debate the meaning of key verbs in § 60506(b). The FCC emphasizes that "prevent" means "to keep from happening" and "eliminate" means "to get rid of, remove." See Fowler, 563 U.S. at 675 ("'prevent' means 'to render (an . . . action or event) impractical or impossible by anticipatory action'" (emphasis omitted)), quoting The Oxford English Dictionary Online (Mar. 2011). But as these definitions confirm, "prevent" in its ordinary meaning is future-oriented, a focus on how to address violations prospectively. See, e.g., United States v. Philip Morris USA, Inc., 396 F.3d 1190, 1198 (D.C. Cir. 2005) ("prevent and restrain" in the RICO statute "indicates that the jurisdiction is limited to forward-looking remedies that are aimed at future violations"). The statute's use of the other key verb directs the FCC to "*identif[y]* necessary steps . . . to take to *eliminate* discrimination," 47 U.S.C. § 1754(b)(2) (emphasis added), again a direction to take forward-looking action rather than to authorize backward-looking remedies like monetary penalties. Thus, the Industry Petitioners contend, the Commission's view does not prevail under a textual analysis of the statute's plain meaning. Even more to the point, they argue, "the very potency" of an ill-defined agency authority to impose potentially ruinous monetary penalties that look very much like common

---

[3]A neighboring IIJA provision, § 60502, established the ACP program offering discounts on broadband service for low-income households. 47 U.S.C. § 1752(b)(1). Congress expressly authorized monetary forfeitures: "[I]n enforcing compliance with this section, [the FCC] may impose forfeiture penalties under section 503 of the Communications Act of 1934." Id. § 1752(b)(9)(C)(ii). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (cleaned up).

law damages would at a minimum require a showing that "its new remedy is a justifiable adjunct to its express statutory mandate" that seems sorely lacking here. ICC v. Am. Trucking Ass'ns, Inc., 467 U.S. 354, 370-71 (1984).

The Commission argues in the alternative that § 4(i) of the Communications Act, 47 U.S.C. § 154(i), referred to as the Act's "necessary and proper clause," provides ancillary authority to employ all potentially available enforcement mechanisms. In general, "ancillary jurisdiction exists only when (1) the Commission's general jurisdictional grant under Title I of the Communications Act covers the regulated subject and (2) the regulations are reasonably ancillary to the Commission's effective performance of its statutorily mandated responsibilities." Mozilla Corp. v. FCC, 940 F.3d 1, 76 (D.C. Cir. 2019) (quotation omitted). The FCC asserts ancillary jurisdiction here based on its authority in Title I of the Communications Act over "all interstate and foreign communication by wire or radio," 47 U.S.C. § 152(a), and because a prohibition lacking its full enforcement authority "cannot reasonably be expected to affect conduct in a meaningful way." Report and Order, 38 FCC Rcd. at 11501 ¶ 122.

The Industry Petitioners argue the Commission's ancillary jurisdiction does not extend to § 60506(b), which was not incorporated into the Communications Act, unlike another section of the IIJA. The Commission argues there are no limitations on the reach of § 4(i). The Industry Petitioners further argue that, even under its broader reading of § 4(i), the FCC must still show that the ability to seek monetary forfeitures is "necessary in the execution" of its mandate under the IIJA, 47 U.S.C. § 154(i). In EchoStar Satellite LLC v. FCC, the D.C. Circuit held that "we refuse to interpret ancillary authority as a proxy for omnibus powers limited only by the FCC's creativity." 704 F.3d 992, 999 (D.C. Cir. 2013), quoting FCC v. Midwest Video Corp., 440 U.S. 689, 706 (1979). Moreover, as the Industry Petitioners point out, the

unavailability of monetary forfeitures would not leave the Commission powerless to remedy digital discrimination.

These were unsettled, difficult issues of statutory authority when the final rule was adopted. But the rule was adopted in a different legal environment, when agencies relied on the courts to give "Chevron deference" to their interpretation of the statutes under which they regulate the private sector. Chevron was overruled in June 2024, and Loper Bright established the standard that will govern judicial review of new final rules adopted to comply with the Commission's IIJA obligation to "adopt final rules to facilitate equal access to broadband internet access service" in compliance with 47 U.S.C. § 1754. Under Loper Bright, our review of whether the IIJA delegates discretionary specific authority "is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits," which entails "fix[ing] the boundaries of [the] delegated authority . . . and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." 603 U.S. at 395 (citation and quotation omitted). This review of a new rule will necessarily include careful review of whether the agency's proposed exercise of its discretionary remedial power "further[s] a specific statutory mandate" and is "directly and closely tied to that mandate." Am. Trucking Ass'ns, 467 U.S. at 367.

Moreover, with the FCC limited to adopting remedies for intentional disparate treatment violations, the question of whether the authority to impose monetary penalties or forfeitures in appropriate cases takes on a much different perspective. The argument that the authority to impose monetary penalties or forfeitures for at least some intentional disparate treatment violations by a more limited universe of covered entities is far different than the authority to impose unlimited, potentially enormous remedies on countless entities not otherwise regulated by the FCC under the now-vacated final rule. Until a new final rule is in place after notice-and-

comment rulemaking, we conclude this facial question of what remedies will pass muster under APA review is outside our Article III jurisdiction.

**(b) APA Arbitrary and Capricious Review Issues.** The APA requires a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is considered arbitrary and capricious if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Bettor Racing, Inc. v. Nat'l Indian Gaming Comm'n, 812 F.3d 648, 651 (8th Cir. 2016), quoting Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). The Industry Petitioners and the Public Interest Petitioners argue that different provisions in the FCC's final rule are arbitrary and capricious agency actions that should be set aside because they violate APA § 706(2)(A).

The Industry Petitioners argue that the FCC's decision adopting a burden-shifting framework for adjudicating disparate impact claims was arbitrary and capricious agency action because it exceeds its statutory remedial authority in § 60506 and departs from the traditional framework applied by the Court in Inclusive Communities.[4] They further challenge as inadequate the FCC's explanation for

---

[4]The Commission acknowledged that Inclusive Communities stated the traditional burden-shifting test and explained the final rule "represents a formulation of this traditional test" tailored to the specific context of § 60506. Report and Order,

departing from the <u>Inclusive Communities</u> burden-shifting framework, its consideration of the rule's costs, and its justification for broadly defining "covered entities."[5]  The Public Interest Petitioners argue (i) the FCC's decision to adopt a final rule that does not allow digital discrimination complainants to file formal complaints, a process authorized if not mandated by IIJA § 60506(e) and despite public comments advocating for that option, was arbitrary and capricious agency action, and (ii) the FCC again violated APA § 706(2)(A) in proposing and then adopting the BEAD safe harbor presumption in the final rule.

At the time the final rule was proposed, considered, and adopted, judicial review of alleged APA § 706(2)(A) violations was highly deferential under the controlling <u>Chevron</u> line of cases:

> Judicial review under [this] standard is deferential, and a court may not substitute its own policy judgment for that of the agency.  A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision.

---

38 FCC Rcd. at 11471 ¶ 63.  But it did not explain why it adopted a test that departs from the traditional framework, effectively requiring covered entities to prove the absence of an alternative policy to avoid liability.  "Reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain its apparent rejection of their approach." <u>Physicians for Soc. Resp. v. Wheeler</u>, 956 F.3d 634, 644 (D.C. Cir. 2020).

[5]The Commission acknowledged that it "does not have sufficient information on the record to quantify the cost of compliance for small entities," but it anticipated "minimal implications" from "including disparate impact in our definition of digital discrimination of access."  <u>Report and Order</u>, 38 FCC Rcd. at 11465 ¶ 52.

FCC v. Prometheus Radio Project, 592 U.S. 414, 423 (2021). Applying this standard, we would assess "whether the agency 'offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" Sugule v. Frazier, 639 F.3d 406, 411 (8th Cir. 2011) (quotation omitted).

Now, Chevron has been overruled, and Loper Bright defines the standard-of-review inquiry. In Custom Communications, Inc. v. FTC, another multidistrict proceeding consolidated for review in this court, we rejected the FTC's contrary contention and held that an agency's compliance with APA procedural requirements is reviewed *de novo* "because compliance is not a matter that Congress has committed to the agency's discretion." 142 F.4th 1060, 1070 (8th Cir. 2025) (quotation omitted). That standard will of course apply in reviewing any APA § 706(2)(A) challenge to the new final rule the FCC is tasked with proposing, considering, and adopting. The arbitrary and capricious issues addressing the Commission's disparate impact liability rules will not be present, or will be significantly different, in reviewing a new final rule limited to disparate treatment liability. In these circumstances, we conclude all APA arbitrary and capricious action challenges are not ripe for review on this administrative record.

### III. Conclusion

For the foregoing reasons, we hold that the Commission exceeded its statutory authority under § 60506 by adopting a final rule that authorized the imposition of disparate impact liability and defined the entities covered by the rule overbroadly. Under the APA, when we "set aside agency action . . . found to be . . . not in accordance with law," 5 U.S.C. § 706(2)(A), "[t]he ordinary practice is to vacate unlawful agency action." United Steel v. Mine Safety & Health Admin., 925 F.3d 1279, 1287 (D.C. Cir. 2019); see Union Pac. R.R. Co. v. Surface Transp. Bd.,

113 F.4th 823, 839 (8th Cir. 2024). Here, as the imposition of disparate impact liability on a wide universe of entities not otherwise regulated by the FCC is at the core of the final rule, we follow our normal practice, vacate the final rule in its entirety, and decline to reach other issues that are no longer ripe for Article III judicial review. We grant in part the Industry Petitioners' petition for review, deny the Public Interest Petitioners' petition for review, and vacate the final rule.

_____